## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAST CHANCE RANCH,

                    Plaintiff,

      v.

LOREN J. MCCUTCHEON and NOAH'S ARK
EDUCATIONAL ZOO, INC.,

                  Defendants.

Civil Action No. _____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Last Chance Ranch ("LCR"), by its attorneys, upon knowledge with respect to its own acts and on information and belief as to other matters, alleges for its Complaint against Defendants Loren J. "Lori" McCutcheon and Noah's Ark Education Zoo, Inc. ("Noah's Ark"), as follows:

### NATURE OF THE ACTION

1.     This is an action by a nationally prominent non-profit animal shelter and rescue against its embattled former executive director Lori McCutcheon and a new non-profit entity she created, arising from their unauthorized use of plaintiff's name and federally registered service marks for improper purposes, which include, but are not limited to, misleading plaintiff's unsuspecting supporters into mistakenly donating money and entrusting vulnerable animals to defendants' shambolic efforts to create a new animal rescue operation, which have so far resulted in widely reported criminal prosecutions of Ms. McCutcheon for animal abuse and neglect in at least three different states.

2.      Plaintiff asserts claims for intentional infringement of its registered service marks LAST CHANCE RANCH (U.S. Reg. No. 5604304) and an illustration (U.S. Reg. No. 6824890) (the "Illustration Mark") (together, the "Marks"), unfair competition and false designation of origin, and cyberpiracy under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a) & (d) and related claims for service mark dilution under 54 Pa. C.S. § 1124.

3.      Plaintiff also asserts related state-law claims for trade libel under 73 P.S. § 201-1 and common law defamation arising from false and *per se* defamatory statements attacking plaintiff and its animal rescue operations that Ms. McCutcheon has published online (including on a website improperly registered in plaintiff's name) and in printed pamphlets she has handed out to volunteers arriving at the ranch to help care for its rescued animals.

4.      LCR seeks injunctive and monetary relief, its reasonable attorneys' fees and costs, and any other and further relief the Court deems just and proper.

## PARTIES

5.      Last Chance Ranch is a Pennsylvania non-profit corporation with a principal place of business in Quakertown, Pennsylvania.

6.      Lori McCutcheon is a citizen of Pennsylvania residing at 9 Beck Road, Quakertown, PA 18951.

7.      Noah's Ark Educational Zoo, Inc. is a Pennsylvania nonprofit corporation with a registered address of 3631 Ridge Road, Perkasie, PA 18944 and places of business in Dunnellon, Florida and Quakertown, Pennsylvania.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this trademark and federal-question case under 28 U.S.C. §§ 1338 & 1331.  The Court has supplemental jurisdiction over Plaintiff's closely related state law claims under 28 U.S.C. § 1367.

9.      The Court has personal jurisdiction over Defendants by virtue of their regular and systematic business contacts with this judicial district and also because a substantial part of the actions giving rise to the claims occurred in this district.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

### A.      Last Chance Ranch and its Mission.

11.     LCR is a Pennsylvania non-profit corporation formed in 1999 that operates a beloved eponymous animal shelter in Bucks County, Pennsylvania.

12.     LCR's mission is to rescue and rehabilitate neglected and mistreated animals—from farm animals like horses, donkeys, sheep, goats, and pigs, to domestic pets like cats, dogs, and small animals—and to promote and educate the public about humane and responsible animal treatment.

13.     In support of this mission, LCR supplies a safe and secure refuge for abused, unwanted, or neglected animals.  It rehabilitates these animals' physical ailments before placing them into homes where they receive the love, attention, and care they deserve.  LCR then provides follow-up programs, educational seminars, and clinics promoting the continued well-being of these animals even after their placement in new homes.

14.     LCR's ability to do this work hinges upon the continued goodwill and loyalty of both volunteers who dedicate time and energy to its day-to-day operations and of LCR's network of charitable animal lovers and allied organizations across the United States who supply tax-deductible financial support.  These indispensable volunteers and supporters have come to know LCR by its Marks.

**B.      McCutcheon's Terminated Affiliation with Last Chance Ranch.**

15.      McCutcheon was a founder of LCR and served as its executive director until 2017.

16.      In or about 2017, McCutcheon entered a period that she has described as "filled with turmoil" in her "personal life."

17.      McCutcheon has written that this arose because, in quick succession, she ended "a long, unhealthy [personal] relationship," her personal horse passed away within months of an unexpected cancer diagnosis, her mother who was suffering from Alzheimer's moved into a nursing home, and her adult children moved away.  Exhibit A is a screenshot of McCutcheon's website describing these events at https://lorislastchanceranch.org/truth-be-told-about-the-new-last-chance-ranch-lcr/.

18.      As McCutcheon has described it, she found her "mind and emotions were in chaos" and sought to "escape the misery."  She began "to self-medicate with alcohol and prescription medications" to "get through [her] days."  Soon, her "chemical abuse" became "desperately" out of control.  *Id.*

19.      Around this time, McCutcheon's conduct at LCR became increasingly erratic and concerning.  LCR documents show that McCutcheon made personal charges on LCR credit cards, paid personal utility bills from LCR funds, and bought a personal cell phone on LCR's Verizon account.  McCutcheon even acquired a personal recreational vehicle using LCR's name.

20.      McCutcheon has previously declared that she was "forced" to "take temporary leave" or been "voted out" or "fired" by LCR.  She was not.  McCutcheon voluntarily resigned from LCR by email dated December 22, 2017.  Exhibit B is McCutcheon's resignation email.

21.      Since her resignation, McCutcheon has not held any formal or informal role with LCR.

22.     McCutcheon's resignation email states that she would, going forward, be "placing [her] energy, expertise and resources into properly building [an] educational zoo."

**C.     Lease Disputes.**

23.     McCutcheon owns the properties that LCR leases for its Quakertown ranch,[1] resulting in various property disputes following McCutcheon's resignation.

24.     While LCR has consistently recognized McCutcheon's ownership of the leased premises and her rights as landlord under the lease, McCutcheon has threatened litigation regarding the right to possession of the property.

25.     McCutcheon has gone so far as to send LCR a Notice of Termination of the lease and a Notice to Quit in an attempt to drive LCR off of the property.

26.     McCutcheon has two defiant trespass convictions against her; one from her entering the LCR office and not leaving after she was instructed to leave and another from her interrupting a horse handling class, insulting the LCR staff, and refusing to leave when instructed to leave.

27.     Wary of losing major expenses from improvements LCR made in reliance of the applicable lease, LCR has also filed a demand for arbitration to obtain a declaratory judgment relating to LCR's right to recover the costs of its improvements to the leased property when the lease terminates.

**D.     McCutcheon's Work on Behalf of Noah's Ark Results in Multiple Criminal Prosecutions for Animal Abuse and Neglect.**

28.     In addition to the property disputes, McCutcheon formed a new entity, Noah's Ark, after her separation from LCR.

---

[1]     9 Beck Road, Quakertown, Pennsylvania and 10 Beck Road, Quakertown Pennsylvania.

29.     Noah's Ark maintained an address very near to LCR on Beck Road in Quakertown, and upon information and belief, now maintains another address in Dunellon, Florida.

30.     Noah's Ark operates a website at "https://noahsedzoo.org/".

31.     On or around the time Noah's Ark was formed, McCutcheon set about obtaining animals for Noah's Ark to "rescue."  Her efforts in this regard have been disastrous.

32.     In early 2019, McCutcheon was arrested and jailed in Pennsylvania on criminal charges for stealing a kangaroo, which the Pennsylvania Game and Wildlife Commission had earlier seized from her for keeping the animal in violation of Pa. Code Title 58.  On the day of her arrest, police officers discovered her "stuffing the kangaroo into a Honda Pilot" with the intention of driving it to Florida.

33.     McCutcheon was arrested and jailed a second time in January 2021 for abusing animals in Florida.  Those charges came after state animal-services officers who stopped her on Interstate-95 near Dunellon discovered that 26 animals—four horses, two donkeys, three miniature horses, eight dogs, seven cats, an alpaca and a lemur—were "crammed into" her trailer.  The animals were "underweight and emaciated."  The animals had no food or water.  Two donkeys that had been forced to lie underneath horses and were "unable to get up," and one had "a severe gash on its neck."  All the animals "were forced to ride on wet hay covered in fecal matter and urine."

34.     McCutcheon was arrested and jailed a third time for mistreating animals in South Carolina in June 2023.  This arrest came after a concerned neighbor sent pictures of "an underweight camel" and several "emaciated" and "extremely neglected" horses she was keeping at a barn in that state.  Authorities who executed a search warrant at that property discovered 57

animals in extremely unsanitary conditions and charged McCutcheon with seven criminal counts of unlawful treatment of animals.

35.     Each of these criminal cases was widely reported in both local and national news media, often alongside shocking pictures of severely emaciated animals.  *See, e.g.*, Exhibit C (CBS News, *Pennsylvania Woman Tried to Kidnap Kangaroo from Petting Zoo, Police Say*, January 18, 2019); Exhibit D (Dan Scanlan, *Trailer crammed with animals in Nassau County prompts cruelty charges against woman*, Florida Times-Union, January 29, 2021); and Exhibit E (Caleb McCusker, *Report:  Woman jailed on animal cruelty charges after animals found living in 'unsanitary conditions' in Horry County*, WBTW News, June 20, 2023).

36.     Any perceived connection between these criminal allegations (or any that may arise in the future) and LCR's completely separate animal rescue in Pennsylvania seriously threatens the goodwill that LCR has diligently earned from both its donors and volunteers.

37.     McCutcheon also registered or caused to be registered the website "http://www.lorislastchanceranch.org" in part to directly compete with and antagonize LCR.

38.     This website has become one of McCutcheon's means of infringing and diluting the Marks, and also for publishing knowingly false and defamatory statements about LCR and its services.

39.     McCutcheon and Noah's Ark have also published defamatory statements and handed out defamatory leaflets containing defamatory statements about LCR and its staff.

**E.     Last Chance Ranch's Ownership of the Marks.**

40.     LCR is the owner of valid and subsisting United States Service Marks Registration Nos. 5604304 and 6824890 on the Principal Register in the United States Patent and Trademark Office ("USPTO") for the service marks LAST CHANCE RANCH and illustration

consisting of a stylized dog laying down with two stylized horse heads to the left of the dog (the "LAST CHANCE RANCH Mark" and "Illustration Mark" respectively).[2]

41.     LCR applied to register the word mark on July 21, 2017.  The Registration was is-sued on November 13, 2018.  Exhibit F is a true and correct copy of the registration certificate for Reg. No. 5604304 (LAST CHANCE RANCH).

42.     LCR has owned common law rights in the Illustration Mark since 2010 through LCR's continuous use of that mark in commerce with LCR's goods and services, as well as through continuous use of significant elements of that mark in commerce since 1999.  The Illustration Mark appears as follows:



43.     On December 16, 2019, McCutcheon applied to register LCR's Illustration Mark. On February 26, 2020, she served a cease-and-desist letter on LCR, containing the Illustration Mark on Noah's Ark's letterhead, demanding LCR stop all use of the Illustration Mark.

---

[2]     U.S. Reg. No. 5604304 is designated for charitable services, namely, fundraising services by means of organizing special events for rescuing and helping animals, and animal rescue services, namely, arranging for the adoption of rescued animals.  U.S. Reg. No. 6824890 is designated for charitable services, namely, fundraising services by means of organizing special events for the rescue and adoption of animals, animal rescue services, namely, boarding for animals, and animal rescue services, namely, arranging for the adoption of rescued animals.

44.     LCR opposed McCutcheon's application for registration of the Illustration Mark, resulting in the institution of an opposition proceeding before the Trademark Trial and Appeal Board ("TTAB") on or around June 25, 2020.

45.     The TTAB sustained LCR's opposition on May 11, 2021.  (Exhibit G.)

46.     As the TTAB records and common sense both show, McCutcheon well knew of the Marks, and even competed for ownership of LCR's Illustration Mark by filing an application for registration, until ultimately conceding ownership to LCR by abandoning the defense of LCR's TTAB opposition.

47.     After the TTAB's decision, LCR applied for and registered the Illustration Mark at the USPTO.  Exhibit H contains a true and correct copy of the registration certificate for Reg. No. 6824890 (Illustration Mark).

48.     Similarly, LCR has always owned the LAST CHANCE RANCH Mark through its continuous use in commerce in connection with its goods and services.

49.     During McCutcheon's tenure with LCR, she frequently corresponded on LCR's letterhead that bears the Marks.  *See, e.g.*, Exhibit I (examples of McCutcheon's correspondence using the Marks).

50.     Both marks were in use in commerce in or about 2010.  Exhibit J (2010 Kennel Campaign); Exhibit K (photograph of the LAST CHANCE RANCH Mark and significant elements of the Illustration Mark in use in commerce in May 1999).

51.     As a result of the widespread, continuous, and exclusive use of the Marks to identify its charitable services and animal rescue services and LCR as their source, LCR owns valid and subsisting federal statutory and common law rights to the Marks.

52.     Similarly, LCR owns valid and subsisting common law rights to the Marks in the Commonwealth of Pennsylvania.

**F.      The Marks are Distinctive and Famous.**

53.     LCR's LAST CHANCE RANCH Mark is distinctive to both the consuming public and LCR's services.  The LAST CHANCE RANCH Mark is suggestive because it requires imagination, thought, and perception to reach a conclusion that the mark is associated with charitable services and animal rescue services, i.e., the final opportunity for the rehabilitation and rescue of animals.  LCR's Illustration Mark is also distinctive to both the consuming public and Plaintiff's services.

54.     Over the years, LCR has achieved success and gained renown in its brand through continuous publication and promotion of its work—including, among other things, by appearing on nationally popular television programs, by sponsoring community programs such as inmate rehabilitation events and police service animal trainings, by hosting an annual gala, and by the sustained hard work of rescuing thousands of animals and placing them in thousands of happy homes.

55.     LCR has expended substantial time, money, and resources marketing, advertising, fundraising, and promoting its services under the Marks.  Evidence of LCR's marketing efforts include Exhibit L (1999–2008 brochure for community outreach and volunteer programs); Exhibit M (a Hoofbeats Newsletter from 2003, showcasing LCR's 4th annual vendor fair featuring the Philadelphia Phillies' mascot; events with local and national politicians, and a schedule of more upcoming events); and Exhibit N (a celebrity visit to the ranch in June 2012 by the famous Country music artist, Trace Adkins).

56.     Through these and other efforts over more than two decades, LCR has developed both a close association with its Marks and a substantial reservoir of goodwill in those marks that makes them tremendously valuable to LCR and its mission.

57.     For example, LCR has over 500 reviews on Google with an average 4.5 out of 5-star rating.  Exhibit O & P (Google Reviews webpage for LCR;  reviews of LCR from Google's verified "Local Guides").

58.     LCR provides charitable services and animal rescue services under the Marks at physical locations including its Quakertown ranch and the Last Chance Ranch Thrift Store, but also through educational events, fundraising events, and programs including horseback riding lessons, summer camps, dog training, birthday parties, individual and group tours, community service opportunities, and room rentals.  *See* Exhibit Q & R (LCR's website displaying its events and programs respectively).

59.     LCR also provides charitable services and animal rescue services under the Marks on the internet via its website, LCR's blog, social media including YouTube and Facebook, news media, and travel blogs.  *See* Exhibits S–V (LCR's blog, a sample promotional YouTube video, news media about LCR, and a travel blog discussing LCR).

60.     Because LCR is a non-profit organization, it utilizes its Marks not only to obtain sales, but also to obtain donations for its charitable services and to secure the rescue of animals. LCR uses its Marks in association with direct donations, donations via the purchase of LCR merchandise, donations via the purchase of items on Amazon.com, Chewy.com, and other websites—where benefactors can buy LCR's animals food, toys, and other items—and donations via the independent purchase and delivery of supplies, fundraisers, bequests, animal sponsorships, and stock donations.

61.     LCR also uses its Marks when it facilitates the adoption of an impressive panoply of dogs, cats, rabbits, guinea pigs, pet birds, reptiles, horses, pigs, goats, geese, chickens, and roosters.  *See* Exhibit W & X (screenshots of LCR's donation and adoption pages of its website, respectively).

62.     Each adoption reduces LCR's financial obligations.  The successful facilitation of these adoptions can be as valuable to LCR as direct donations.

63.     For example, basic care of a horse can cost from $100 to $300 per month.  In some cases, LCR has devoted thousands of dollars to save one animal's life.  Dogs and other small companion pets can be expensive as well requiring blood tests, vaccinations, worming, flea & tick treatments, heartworm prevention, microchipping, spaying/neutering, food, heated kennels in winter, and air-conditioned kennels in summer.

64.     LCR offers its charitable services and animal rescue services under its Marks to a wide range of consumers including, farmers and ranchers, rescuers of companion animals, participants in its variety of events and programs, and anyone who is interested in animal philanthropy.

65.     LCR's charitable services and animal rescue services are of high quality in the field of charitable services and animal rescue services due the scale of LCR's operation, its diverse and accommodating facilities, and its specially qualified staff.

66.     LCR is located on an expansive 35 acres in Upper Bucks County.

67.     LCR's facility includes a nine-stall barn, indoor riding arena, many pastures with run-in sheds, a fifteen-run kennel, small animal room, grooming suite, and several meeting rooms that can be used for educational programs and events.  LCR's facility has the ability to house more than 150 animals of all types.

68.     The Community Center at LCR offers three different rooms that can accommodate events for up to 100 people for business meetings, parties, celebrations, professional/clinical presentations and more.

69.     LCR's staff are also uniquely educated, experienced, and certified to provide top quality charitable services and animal rescue services.  Exhibit Y is a true and correct copy of LCR's webpage describing its staff's qualifications, certifications, and experience.

70.     As a result of LCR's expenditures and efforts, the Marks have come to signify the high quality of charitable services and animal rescue services designated by the Marks, and acquired incalculable distinction, reputation, and goodwill belonging exclusively to LCR.

71.     As a result of its distinctiveness and widespread use and promotion, Plaintiff's LAST CHANCE RANCH mark and Illustration Mark are famous within the niche geographic region of Pennsylvania and in the subset of consumers in the charitable services and animal rescue services.

**G.     Defendants Have Substantially Infringed and Diluted the Marks.**

72.     Defendants McCutcheon and Noah's Ark purport to be engaged in charitable services and animal rescue services.

73.     After McCutcheon's resignation, without LCR's authorization and later expressly forbidden by LCR, McCutcheon and Noah's Ark have held and continue to hold themselves out as LCR or its' affiliates, agents, or representatives whenever they believe that doing so would serve their own personal interests.

74.     McCutcheon and Noah's Ark adopted and began using the mark "Lori's Last Chance Ranch" (hereinafter, the "Infringing Word Mark") and an exact copy of LCR's illustration mark (hereinafter, the "Infringing Illustration Mark") (collectively the "Infringing Marks") in commerce.

75.     The Infringing Word Mark adopted and used by Defendants is confusingly similar to LCR's LAST CHANCE RANCH Mark.  They have the exact same words, "Last Chance Ranch" with the only distinguishing factor being the prefix "Lori's" in the Infringing Word Mark.

76.     The Infringing Illustration Mark adopted and used by Defendants is identical to LCR's Illustration Mark.  Below is a comparison of LCR's Illustration Mark and an example of the infringing Illustration Mark in use in McCutcheon's book "Who Rescued Who?":



| LCR's Illustration Mark | Cover of McCutcheon's Infringing Book (lorislastchanceranch.org) |
|---|---|

77.     Defendants have been engaged in the marketing, advertising, fundraising, and promotion of charitable services and animal rescue services using the Infringing Marks throughout the United States.

78.     The most glaring example is McCutcheon's website www.lorislastchanceranch.org.  The domain name itself evokes the phrase "Lori's Last Chance Ranch."

79.     The website both impermissibly incorporates LCR's LAST CHANCE RANCH Mark in its entirety and asserts the false and misleading proposition that "Last Chance Ranch" somehow belongs to McCutcheon.

80.     The site's content only makes matters worse.  On every page, the site prominently solicits visitors to donate to a "rescue non-profit" called "Lori's Last Chance Ranch."

81.     It is impossible to donate to the "rescue nonprofit" known as "Lori's Last Chance Ranch" because no such rescue nonprofit exists.

82.     There is only:  the rescue nonprofit, Last Chance Ranch, which is known across the country for its good and noble work, but which has had no affiliation with Lori for almost a decade following her resignation in the wake of a substance abuse crisis; and the rescue nonprofit Noah's Ark Educational Zoo, which does have an affiliation with Lori, and which, as a result, is known in the public imagination—to the extent it is known at all—primarily for "stuffing" a kidnapped Kangaroo into a Honda Pilot in PA, for "jamming" a wounded donkey and 25 other neglected animals into a trailer in FL, and for keeping dozens of emaciated animals in criminally unsanitary conditions in SC.

83.     McCutcheon's site uses the former's (LCR's) name and marks to solicit payments to the latter (Noah's Ark).

84.     This amounts, at best, to an intentional and fraudulent attempt to sow confusion between the two organizations to the detriment of LCR and the benefit of McCutcheon and Noah's Ark.

85.     Additional infringement on that site increases the likelihood that such confusion will arise.  For example, the "shop" page offers for sale a single book prominently featuring LCR's registered Illustration Mark on its cover; the "press" page consists entirely of images and

embedded YouTube videos created during McCutcheon's employment at LCR and displaying both of the Marks; and the "Truth Be Told" page—which describes (the one and only) Last Chance Ranch as "the New Last Chance Ranch (LCR)"— and includes declarations such as "I AM LCR!" is undeniably intended to sow confusion and antagonize LCR.

86.     Media similar to that currently appearing on the "press" page of that website has previously been used on Noah's Ark's website.

87.     McCutcheon and Noah's Ark sow confusion online via several outlets outside of lorislastchanceranch.org.

88.     Upon information and belief, McCutcheon manages Facebook and Instagram accounts for "lorilastchanceranch". Exhibit Z and AA are screenshots of each account respectively.

89.     Upon information and belief, following her resignation, McCutcheon and Noah's Ark have held fundraisers using a "lorislastchanceranch" Facebook page. Exhibit BB is a true and correct copy of an image of one of those fundraisers.

90.     Upon information and belief, and following her resignation, McCutcheon and Noah's Ark have used the hashtag "#lastchanceranch" in affiliation with their charitable services and animal rescue services. Exhibit CC is a true and correct copy of a screenshot from an Instagram post that utilizes this hashtag.

91.     Upon information and belief, McCutcheon and Noah's Ark use a Venmo account under the name "lorislastchanceranch". Attached as Exhibit DD is a true and correct copy of an image showing the Venmo account.

92.     Upon information and belief, McCutcheon and Noah's Ark used the Infringing Word Mark in affiliation with a GoFundMe campaign.  Attached as Exhibit EE is a true and correct copy of an image showing the GoFundMe campaign.

93.     McCutcheon and Noah's Ark's infringing and diluting activities are not restricted to digital spaces.  McCutcheon and Noah's Ark have used or are currently using LCR's Illustration Mark in their business cards.  Exhibit FF is a true and correct copy of an example of said business cards.

94.     Following her resignation, McCutcheon drove or continues to drive a vehicle bearing the Marks, confusing the consuming public as to whether she and/or Noah's Ark are associated with LCR.  Exhibit GG is a true and correct copy of a Facebook conversation with Karlie Shelyne Harrell asking Jackie Burke, the executive director of LCR, whether McCutcheon was affiliated with LCR and noting that McCutcheon is driving around Florida in a truck with the LCR name on the side.

95.     In that same correspondence Harrel also reported that McCutcheon, "has been to a couple [Florida] residents flashing a badge and telling people she's going to come by weekly to check on [their] animals", "[is] driving a big black truck with [LCR's] sign on the side of it", and is "telling people that having that badge she can come onto any property to seize animals she finds to be not care for properly …"  *Id*.  Harrell advised that "with all the issues going on with horses being killed, slaughtered or coming up missing lately [she] was just [a little] concerned especially with it being an out of state rescue …"  *Id*.  Finally, Harrell told Burke, "I know it's a long ways away but she sure isn't giving your rescue a good name with anyone down here with her behavior".  *Id*.

96.     Following her resignation, McCutcheon and/or Noah's Ark have represented themselves as LCR in order to purchase items and animals.[3]

97.     McCutcheon, well after her resignation, purchased seven horses under LCR's bidder number at New Holland Sales Stables, an animal auction in New Holland, Pennsylvania. LCR filed a police report with the New Holland Police Department shortly after that incident. Exhibit HH is a true and correct copy of receipts from New Holland Sales Stables.

98.     In association with those purchases, McCutcheon also purchased equine blood tests called "Coggins Tests," falsely advising a veterinarian that said tests were issued for horses bought for LCR.

99.     Well after her resignation, McCutcheon acquired seven cats and three dogs from Burlington County Animal Shelter in New Jersey using LCR's name.

100.     Well after her resignation, McCutcheon has signed documents representing herself as affiliated with LCR by signing receipts of purchases at Tractor Supply Co.  Exhibit II is a true and correct copy of an example of such receipts.

101.     McCutcheon and Noah's Ark's infringing and diluting activities have resulted in substantial, documented evidence of actual confusion and dilution.

102.     Well after her resignation, McCutcheon purchased and registered a trailer under LCR's name.  LCR received a toll from the Maryland Toll Authority for a trailer that was registered to LCR but did not belong to LCR.  Exhibit JJ is a true and correct copy of the toll.

---

[3]     LCR has reported Ms. McCutcheon's conduct to the Pennsylvania Office of the Attorney General.

103. Upon information and belief, McCutcheon and/or Noah's Ark represented themselves to be associated with LCR and utilized the Illustration Mark to divert the donation of multiple horse tack trunks from a donator in December 2022.

104. Exhibit KK is a screenshot from Venmo showing a donation to McCutcheon's "lorilastchanceranch" Venmo that account appears to have been intended for LCR, as suggested by the donor's message "Donation for Last Chance Ranch from Maddie Wilson."

105. Upon information and belief, in October 2023, McCutcheon delivered a puppy to a consumer, bearing tags stating the puppy originated from LCR, when it did not.

106. Upon information and belief, and well after her resignation, donators have been confused as to whether they can use 9 Beck Road in Quakertown as an address to send donations to Noah's Ark, which is the address of LCR. Exhibit LL is evidence of confusion.

107. Upon information and belief, as recently as March 2024, McCutcheon listed the address as Last Chance Ranch's address for dogs she or Noah's Ark have available for adoption.

108. On March 2, 2024, a confused consumer entered the LCR office asking for "Lori" and expecting to adopt a dog from her.

109. As evidenced above, the charitable services and animal rescue services Defendants have marketed, advertised, fundraised for, and promoted under the Infringing Marks are wholly related to and in competitive proximity with LCR's charitable services and animal rescue services.

110. As evidenced above, Defendants have marketed, advertised, fundraised for, promoted, and sown confusion for their charitable services and animal rescue services under the Infringing Marks through a variety of mediums including websites, social media, interactions

with storefronts and auctions, direct consumer interactions, and the diversion of donations, among other things.

111.     Defendants offer their charitable services and animal rescue services under the Infringing Marks to the same consumers as LCR, namely to farmers and ranchers, rescuers of companion animals, and anyone who is interested in animal philanthropy.

112.     The charitable services and purported animal rescue services Defendants offer under the Infringing Marks are wholly deficient in quality such that Defendants services have a pattern of violating laws as to the care and treatment of animals.  *See* Exhibits E & D.

113.     Such lower quality services have resulted in the dilution of the Marks. Exhibit MM is a true and correct copy of a Facebook post discussing McCutcheon, affiliating her with LCR well after her resignation, and expressing concern over the quality of LCR's animal rescue services.

114.     LCR has attempted to vigorously enforce its statutory and common law rights in its Marks while also being mindful of the expense of litigation in perspective of its "donors" valuable contributions.

115.     LCR has advised the Pennsylvania's Office of the Attorney General and other law enforcement bodies of any illegal conduct.

116.     On May 2, 2023, LCR's counsel sent a cease-and-desist letter to McCutcheon objecting to Defendants' use of the Infringing Marks.  *See* Exhibit NN.

117.     On April 15, 2024, LCR's counsel sent another cease-and-desist letter to McCutcheon objecting to Defendants' use of the Infringing Marks.  Exhibit OO is a true and correct copy of LCR's counsel's April 15, 2024 cease and desist letter emailed to McCutcheon.

118.     To date, LCR has received no response to its cease-and-desist letters and, after reasonable inquiry, has no evidence that Defendants have complied with the demands set out in LCR's counsel's cease and desist letters.

119.     Defendants' infringing acts as alleged herein have caused and are likely to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of Defendants' charitable services and animal rescue services and have and are likely to deceive the relevant consuming public into believing, mistakenly, that Defendants' charitable services and animal rescue services originate from, are associated or affiliated with, or otherwise authorized by LCR.

120.     As evidenced above, Defendants' infringing acts as alleged herein have resulted in actual confusion.

121.     Upon information and belief, Defendants' acts are willful with the deliberate intent to trade on the goodwill of the Marks, cause confusion and deception in the marketplace, and divert potential donations and adoptions from LCR to Defendants.

122.     Defendants' acts are causing and, unless restrained, will continue to cause damage and immediate irreparable harm to LCR and to its valuable reputation and goodwill with the consuming public for which LCR has no adequate remedy at law.

**H.     McCutcheon's Defamation of Last Chance Ranch.**

123.     McCutcheon has also published defamatory material about LCR to LCR's volunteers and the public at large.

124.     On or around June 29, 2023, Noah's Ark posted a quote on Facebook, representing that an anonymous person made a false and defamatory statement directed toward LCR.  A true and correct copy of which is attached as Exhibit PP.

125.     On November 4, 2023 through November 8, 2023, McCutcheon passed out defamatory leaflets to volunteers at LCR.  Exhibit QQ is a true and correct copy of the leaflet. Those leaflets, in effect, make similar false and defamatory statements as above.

126.     By way of example, in the leaflet, McCutcheon said, "Now I see them putting animals in harm's way due to being untrained and ignorance.  I have documented proof of 4 deaths of equines, videos, etc. and undocumented stories of dozens more animals that are perishing due to their inability to give proper care."

127.     Although it is true that a number of years ago four horses died at LCR, none of these animals died due to the inability of LCR to give proper care.  On the contrary, except for Luke, who died at the end of his natural life expectancy, all of them were euthanized due to terminal illnesses.  These horses were seen by veterinarians for treatment and it was determined that euthanasia was the most humane option.  Their deaths were not the result of any neglect by LCR staff.

128.     In the leaflet, McCutcheon said, "I still have eyes and friends all over the ranch that fill me in on the horrors of what's going on at LCR and how they are running the place into the ground, partying and having the time of their lives on the unknowing donors' dollars."

129.     No "horrors" have occurred as claimed by McCutcheon.  Moreover, the only activities occurring at LCR that conceivably could be considered parties are the Annual Volunteer Appreciation Dinners.  These dinners are sponsored by donors who know exactly what they are funding.  Such a statement falsely asserts that LCR is improperly, and illegally, using its donors' valuable contributions.

130.     By way of one more example, in the leaflet McCutcheon said, "I have proof of them 'rescuing' a pony from the auction for $2700.  (That's a rescue price?)".

131.    Such a statement asserts that LCR acted improperly when it purchased a pony at auction for $2,700.  The pony was purchased for LCR by a donor who paid the $2,700.  This donor accompanied LCR to the auction and made the purchase specifically for LCR's lesson program.

132.    Upon information and belief, Defendants either knew the statements were false or acted in reckless disregard of whether the statements were true or false.

133.    McCutcheon has published a similar screed on her website at the webpage entitled, "Truth Be Told".  Exhibit A.

134.    The statements on that page and the other similar statements that McCutcheon or Noah's Ark have published and distributed in other physical and electronic forms, contain a number of malicious and defamatory false statements about LCR and its representatives and volunteers, including some that implicate fictional violations of law by LCR in its offering of charitable services and animal rescue services.

135.    Any and all recipients of such communications would, if believing these statements to be true, understand them to be harmful to the reputation of and directed toward LCR.

136.    Upon information and belief, Defendants intended to cause pecuniary loss or reasonably should have known the false statements would cause pecuniary loss.

137.    Upon information and belief, LCR has sustained pecuniary loss because of Defendants' false statements.

138.    LCR has pleaded with McCutcheon and Noah's Ark to cease and desist.  To date, she has either ignored these demands or has responded with various accusations against LCR and its staff.  Meanwhile, her own conduct has grown steadily more unhinged.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### INTENTIONAL INFRINGEMENT OF THE WORD MARK
### (15 U.S.C. § 1114(1))

139.     LCR incorporates each paragraph above as if fully set forth here.

140.     Defendants' unauthorized use in commerce of the Infringing Word Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants charitable services and animal rescue services, and is likely to cause consumers to believe, contrary to fact, that Defendants' charitable services and animal rescue services are provided, authorized, endorsed, or sponsored by LCR, or that Defendants are in some way affiliated with or sponsored by LCR.  Defendants' conduct therefore constitutes service mark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

141.     Defendants have committed the foregoing acts of infringement with full knowledge of LCR's prior rights in the LAST CHANCE RANCH Mark and with the willful intent to cause confusion and trade on LCR's goodwill.

142.     Defendants' conduct is causing immediate and irreparable harm and injury to LCR, and to its goodwill and reputation, and will continue to both damage LCR and confuse the public unless enjoined by this court.  LCR has no adequate remedy at law.

143.     LCR is entitled to, among other relief, injunctive relief and an award of actual damages, Defendants' profits or donations, enhanced damages and profits or donations, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## SECOND CLAIM FOR RELIEF
## INTENTIONAL INFRINGEMENT OF THE ILLUSTRATION MARK
## (15 U.S.C. § 1114(1))

144.    LCR incorporates each paragraph above as if fully set forth here.

145.    Defendants' unauthorized use in commerce of the Infringing Illustration Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants charitable services and animal rescue services, and is likely to cause consumers to believe, contrary to fact, that Defendants' charitable services and animal rescue services are provided, authorized, endorsed, or sponsored by LCR, or that Defendants are in some way affiliated with or sponsored by LCR.  Defendants' conduct therefore constitutes service mark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

146.    Defendants have committed the foregoing acts of infringement with full knowledge of LCR's prior rights in the Illustration Mark and with the willful intent to cause confusion and trade on LCR's goodwill.

147.    Defendants' conduct is causing immediate and irreparable harm and injury to LCR, and to its goodwill and reputation, and will continue to both damage LCR and confuse the public unless enjoined by this court.  LCR has no adequate remedy at law.

148.    LCR is entitled to, among other relief, injunctive relief and an award of actual damages, Defendants' profits or donations, enhanced damages and profits or donations, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## THIRD CLAIM FOR RELIEF
## FEDERAL UNFAIR COMPETITION OF THE WORD MARK
## (15 U.S.C. § 1125(a))

149.    LCR incorporates each paragraph above as if fully set forth here.

150.     Defendants' unauthorized use in commerce of the Infringing Word Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' charitable services and animal rescue services, and is likely to cause consumers to believe, contrary to fact, that Defendants' charitable services and animal rescue services are provided, authorized, endorsed, or sponsored by LCR, or that Defendants are in some way affiliated with or sponsored by LCR.

151.     Defendants' unauthorized use in commerce of the Infringing Word Mark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

152.     Upon information and belief, Defendants' conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with LCR.

153.     Defendants' conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

154.     Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to LCR, and to its goodwill and reputation, and will continue to both damage LCR and confuse the public unless enjoined by this court.  LCR has no adequate remedy at law.

155.     LCR is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant's profits or donations, enhanced damages and profits or donations, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

### FOURTH CLAIM FOR RELIEF
### FEDERAL UNFAIR COMPETITION OF THE ILLUSTRATION MARK
### (15 U.S.C. § 1125(a))

156.     LCR incorporates each paragraph above as if fully set forth here.

157.     Defendants' unauthorized use in commerce of the Infringing Illustration Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendants' charitable services and animal rescue services, and is likely to cause consumers to believe, contrary to fact, that Defendants' charitable services and animal rescue services are provided, authorized, endorsed, or sponsored by LCR, or that Defendants are in some way affiliated with or sponsored by LCR.

158.     Defendants' unauthorized use in commerce of the Infringing Illustration Mark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

159.     Upon information and belief, Defendants' conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with LCR.

160.     Defendants' conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

161.     Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to LCR, and to its goodwill and reputation, and will continue to both damage LCR and confuse the public unless enjoined by this court.  LCR has no adequate remedy at law.

162.     LCR is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant's profits or donations, enhanced damages and profits or donations, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

### FIFTH CLAIM FOR RELIEF
### CYBERPIRACY BY LORI MCCUTCHEON
### (15 U.S.C. § 1125(d))

163.     LCR incorporates each paragraph above as if fully set forth here.

164.     McCutcheon's history, experience, knowledge, and correspondence as alleged herein, plus any and all other facts relevant thereto, demonstrate a bad faith intent to profit from the LAST CHANCE RANCH Mark under the meaning of 15 U.S.C. § 1125(d)(A)(i).

165.     McCutcheon registered, trafficked in, and uses a domain name that at the time of registration of the domain name is identical or confusingly similar to the LAST CHANCE RANCH MARK.

166.     McCutcheon's conduct as alleged herein constitutes cyberpiracy under section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

167.     LCR is entitled to, among other relief, the forfeiture or cancellation of the domain name "lorislastchanceranch.org" or the transfer of the domain name to LCR.

## SIXTH CLAIM FOR RELIEF
## DILUTION OF THE WORD MARK
### (54 PA. C.S. § 1124)

168.     LCR incorporates each paragraph above as if fully set forth here.

169.     As alleged herein, LCR's LAST CHANCE RANCH Mark is famous within Pennsylvania and within the niche consumers in the charitable services and animal rescue services.

170.     Defendants began using the Infringing Word Mark in commerce after LCR's LAST CHANCE RANCH Mark became famous.

171.     Defendants' use reduces the capacity of the LAST CHANCE RANCH Mark to identify and distinguish LCR's services.

172.     Defendants' use of the Infringing Word Mark was and continues to be willful.

173.     LCR is entitled to, among other relief, injunctive relief, monetary damages, disgorgement of profits, judgment for an amount not to exceed three times the profits and

damages, reasonable attorneys' fees, and destruction of any infringing products.  54 Pa. C.S.A. §§ 1124 and 1125.

## SEVENTH CLAIM FOR RELIEF
## DILUTION OF THE ILLUSTRATION MARK
### (54 PA. C.S. § 1124)

174.     LCR incorporates each paragraph above as if fully set forth here.

175.     As alleged herein, LCR's Illustration Mark is famous within Pennsylvania and within the niche consumers in the charitable services and animal rescue services.

176.     Defendants began using the Infringing Illustration Mark in commerce after LCR's Illustration Mark became famous.

177.     Defendants' use reduces the capacity of the Illustration Mark to identify and distinguish LCR's services.

178.     Defendants' use of the Infringing Illustration Mark was and continues to be willful.

179.     LCR is entitled to, among other relief, injunctive relief, monetary damages, disgorgement of profits, judgment for an amount not to exceed three times the profits and damages, reasonable attorneys' fees, and destruction of any infringing products.  54 Pa. C.S.A. §§ 1124 and 1125.

## EIGHTH CLAIM FOR RELIEF
## COMMON LAW DEFAMATION

180.     LCR incorporates each paragraph above as if fully set forth here.

181.     Defendants published defamatory communications about LCR via physical delivery of leaflets and online to third parties and the general public.

182.     Defendants understood those communications to be false, or at least acted in reckless disregard of their truth or falsity.

183.     Defendants intended such statements to cause pecuniary loss or reasonably should have known the false statements would cause pecuniary loss to LCR.

184.     Defendants' statements explicitly or implicitly aver that LCR has committed criminal acts and/or committed business misconduct.

185.     LCR sustained pecuniary loss because of Defendants' false and defamatory statements.

186.     LCR is entitled to, among other relief, injunctive relief and monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Last Chance Ranch requests judgment against Defendants as follows:

1.     A declaration that Defendants have violated Section 32 of the Lanham Act (15 U.S.C. § 1114); Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); and that McCutcheon has violated Section 43(d) of the Lanham Act (15 U.S.C. § 1125(d)).

2.     A declaration that Defendants have violated Pennsylvania's anti-dilution law under the Pennsylvania Trademark Act, 54 Pa. C.S. § 1124.

3.     A declaration that Defendants have defamed Last Chance Ranch.

4.     A preliminary and permanent injunction against Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, barring them from:

a.     Offering, marketing, advertising, fundraising, promoting, or authorizing any third party to market, advertise, fundraise or promote charitable services and animal rescue

services bearing the Marks, or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Marks;

      b.      Engaging in any activity that infringes LCR's rights in its Marks;

      c.      Engaging in any activity constituting unfair competition with LCR;

      d.      Engaging in any activity that is likely to dilute the distinctiveness of the Marks;

      e.      Making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) Defendants' charitable services and animal rescue services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with LCR, or (ii) LCR's charitable services and animal rescue services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Defendants;

      f.      Using or authorizing any third party to use in connection with any business, goods, or services any false description, false representation, or false designation of origin, or any marks, names, words, symbols, devices, or trade dress that falsely associate such business, goods and/or services with LCR or tend to do so;

      g.      Registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating the mark "Lori's Last Chance Ranch" or any other mark that infringes or is likely to be confused with the Marks, or any goods or services of LCR, or LCR as their source; and

      h.      Aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) through (g).

5.      Such other and further injunctive relief as the Court may deem proper.

6.      An order directing Defendants to immediately cease all manufacture, display, distribution, marketing, advertising, fundraising, promotion, sale, offer for sale, and/or use of any and all materials that feature or bear any designation or mark incorporating the Marks, or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Marks, and to direct all other individuals and establishments wherever located in the United States that distribute, advertise, promote, sell, or offer for sale the Defendant's goods or services to cease forthwith the display, distribution, marketing, advertising, fundraising, promotion, sale, and/or offering for sale of any and all goods, services, and other materials featuring or bearing the mark "Lori's Last Chance Ranch" or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Marks, and to immediately remove them from public access and view.

7.      An order directing that Defendants recall and deliver up for destruction or other disposition all goods, advertisements, promotions, signs, displays, and related materials incorporating or bearing the mark "Lori's Last Chance Ranch" or any other mark that is a counterfeit, copy, confusingly similar variation, or colorable imitation of the Marks.

8.      Directing that Defendant McCutcheon immediately and permanently shut down the web domain "lorislastchanceranch.org".

9.      Directing that Defendants immediately and permanently remove and delete all published defamatory allegations against LCR.

10.      Directing, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. § 1116(a)), Defendants to file with the court and serve upon LCR's counsel within thirty (30) days after service on Defendants of an injunction in this action, or such extended period as the court may

direct, a report in writing under oath, setting forth in detail the manner and form in which Defendants have complied therewith.

11.     Awarding LCR an amount up to three times the amount of its actual damages, in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)).

12.     Directing that Defendants account to and pay over to LCR all donations or profits realized by its wrongful acts in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)), enhanced as appropriate to compensate LCR for the damages caused thereby.

13.     Awarding LCR punitive and exemplary damages as the court finds appropriate to deter any future willful infringement.

14.     Declaring that this is an exceptional case pursuant to Section 35(a) of the Lanham Act and awarding LCR its costs and reasonable attorneys' fees thereunder (15 U.S.C. § 1117(a)).

15.     Awarding LCR interest, including prejudgment and post-judgment interest, on the foregoing sums.

16.     Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  April 20, 2024

*/s/ John J. Powell*

John J. Powell (PA 312589)
Zachary J. Holdsman (PA 331750)
MONTGOMERY McCRACKEN
  WALKER & RHOADS LLP
1735 Market Street
Philadelphia, PA  19103
Phone:  (215) 772-7298
Fax:  (215) 731-3742
jpowell@mmwr.com
zholdsman@mmwr.com

*Counsel for Last Chance Ranch*